IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CRIMINAL NO. JKB-19-0132 |
| J.J.P. (Male Juvenile), | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

On March 20, 2019, the government filed a Juvenile Information (Information, ECF No. 1) against Male Juvenile ("J.J.P.") charging him with numerous criminal offenses: Conspiracy to Participate in a Racketeering Enterprise (Count I), Racketeering (Count II), Attempted Murder in Aid of Racketeering (Counts III and V), Assault with a Dangerous Weapon Resulting in Serious Bodily Injury in Aid of Racketeering (Counts IV and VI), and Assault with a Dangerous Weapon in Aid of Racketeering (Count VII). The charges relate to two murders, two assaults, and other racketeering activity that J.J.P. was allegedly involved with as a member of the Fulton clique of MS-13. (Information ¶ 14.) Although J.J.P. has since reached the age of maturity, he was under the age of eighteen at the time of the alleged offenses. (*Id.* ¶ 1.)

On May 3, 2019, the government moved to transfer the case to United States District Court to prosecute J.J.P. as an adult. (Mot. Transfer, ECF No. 22.) Under the Juvenile Justice and Delinquency Prevention Act ("JJDPA"), 18 U.S.C. § 5031 *et seq.*, the government can prosecute a juvenile as an adult in federal court where the court has jurisdiction over the case and transfer to adult status is "in the interest of justice." § 5032. A hearing was held on January 13, 2020 to

1

determine the appropriateness of transfer. For the reasons set forth below, the Court will grant the government's motion to transfer J.J.P. to adult status.

## I. *Jurisdiction*

To establish jurisdiction over a juvenile in federal court under § 5032, the office of the U.S. Attorney General must certify one of three jurisdictional bases: (1) the juvenile court or other state court lacks or refuses jurisdiction, (2) the state lacks available programs or services adequate for juvenile needs, or (3) the offense charged is either a felony crime of violence or an offense under certain federal gun and drug laws, and there is a substantial federal interest in the case. In determining jurisdiction, the court "is entitled to accept the prosecution's allegations as true." *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir. 2009).

The government invokes the first and third grounds as a basis for jurisdiction. In support of the first ground, the government contends "the acts of delinquency span several counties[,] so no state court can adjudicate them all." (Certification ¶¶ 3, 4, ECF No. 3.) In support of the third ground, the government points to the violent nature of the charged offenses and the substantial resources the government has invested into the prosecution of closely related criminal matters. (*Id.* ¶¶ 1, 3.)

Accepting the government's allegations as true, *see Juvenile Male*, 554 F.3d at 460, the Court concludes there is jurisdiction under either ground one or ground three.

## II. *The Interests of Justice*

"The [g]overnment has the burden of proving that a transfer would be in the interest of justice by preponderance of the evidence." *United States v. Robinson*, 404 F.3d 850, 858 (4th Cir. 2005). Section 5032 sets forth six factors for a court to weigh in making this determination:

> [1] the age and social background of the juvenile; [2] the nature of the alleged offense; [3] the extent and nature of the juvenile's prior delinquency record; [4] the juvenile's present

2

intellectual development and psychological maturity; [5] the nature of past treatment efforts and the juvenile's response to such efforts; [6] the availability of programs designed to treat the juvenile's behavioral problems.

"The district court may determine what weight to give the various factors," but "the nature of the crime clearly predominates." *Robinson*, 404 F.3d at 858 (citation omitted). In reviewing the factors, a court should "assume that . . . the juvenile committed the offense charged in the information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995).

The Court considers the relevant factors in turn.

### 1. *Juvenile's Age and Social Background*

A court should consider the juvenile's age at the time of the alleged offenses; an age "toward the higher end of the spectrum (eighteen)" weighs in favor of transfer, while an age toward "the lower end (fifteen)" weighs against transfer. *Juvenile Male*, 554 F.3d at 468–69. The juvenile's age at the time of the transfer hearing can also be relevant, as it can indicate whether he is likely to be amenable to juvenile-type rehabilitative programs. *Nelson*, 68 F.3d at 589.

J.J.P. was fifteen years and eleven months at the time of the murders; sixteen years and one month at the time of the assaults. (Mot. Transfer at 3.) His age, therefore, was on the lower end of the spectrum, which clearly cuts against transfer. The fact that J.J.P. has since reached the age of maturity—he is now eighteen years and eight months—does not outweigh the significance of J.J.P.'s young age at the time he committed the alleged offenses.[1]

---

[1] J.J.P. asserts the Court should not consider J.J.P.'s current age at all, as the government engaged in gamesmanship by delaying the filing of charges against him in order to increase the likelihood that he would be transferred to adult status. (Opp'n Mot. Transfer at 4, ECF No. 34.) But age at the time of a transfer hearing is generally relevant "unless the government intentionally delays the filing of juvenile charges." *Nelson*, 68 F.3d at 589. There is no indication the government intentionally delayed filing charges here. As the government explained in open court, the status of this case is comparable to the status of the cases involving the other alleged participants in the murders and assaults at issue here. (*See* JKB-16-cr-259.) Accordingly, the Court can consider J.J.P.'s current age; the question of how much to weigh it is within the Court's discretion. *See Robinson*, 404 F.3d at 858.

This factor also requires courts to consider a juvenile's social background. In considering social background, a court can consider, among other things, stability inside and outside the juvenile's home as well as the "structure and support" available to him. *Juvenile Male*, 554 F.3d at 469. The existence of a loving home can weigh in favor of transfer, *Robinson*, 404 F.3d at 859, while early involvement in gang activity and poor attendance in school can indicate a lack of structure and weigh against transfer, *Juvenile Male*, 554 F.3d at 469.

J.J.P.'s social background cuts both ways. Although J.J.P. appears to have a loving and supportive relationship with his mother, several factors indicate a lack of structure and stability: J.J.P. lost his father to gang violence in El Salvador (Gov't Ex. 6 at 3, ECF No. 22-6), J.J.P. crossed the United States border alone as an unaccompanied minor (*id.*), he became involved with gang activity at a young age (age fifteen, if not earlier), and he had a poor attendance record in school (*id.* at 4.).

The Court concludes that the challenges in J.J.P.'s background, combined with his young age at the time of the alleged offenses, results in this factor weighing against transfer.

### 2. *The Nature of the Alleged Offense*

The second factor in the transfer analysis "clearly predominates." *Robinson*, 404 F.3d at 858 (citation omitted). "[S]erious, violent crimes" can weigh heavily in favor of transfer. *See id.* at 859 (affirming district court's conclusion that a series of armed robberies weighed heavily in favor of transfer). Crimes committed in furtherance of gang activity can also weigh heavily in favor of transfer. *See Juvenile Male*, 554 F.3d at 469 (affirming district court's conclusion that participation in violent criminal activity on behalf of MS-13 weighed heavily in favor of transfer).

The government alleges that J.J.P. directly participated in two gruesome and premediated murders on behalf of MS-13. (Information ¶ 25.) According to the government, J.J.P., along with

other MS-13 members, lured one suspected rival gang member to a park, stabbed him over 100 times with sharp objects, removed his heart, and buried him in a grave. (*Id.*) Two weeks later, the government contends, J.J.P. and other MS-13 members lured another suspected rival gang member to a park, killed him by striking him with machetes, and then cut off his leg so that his body would fit into a shallow grave. (*Id.*; Mot. Transfer at 6.) Additionally, the government alleges that two months later, J.J.P. and other MS-13 members participated in two violent assaults that left both victims with serious injuries. (Information ¶ 25; Mot. Transfer at 6–7.) Finally, the government contends that J.J.P. was involved in other gang activity, including the distribution of marijuana, extortion, and the possession of firearms. (Information ¶ 25.)

This factor weighs heavily in favor of transfer. Although participation in any murder is likely sufficiently "serious" and "violent" for this factor to weigh in favor of transfer, *Robinson*, 404 F.3d at 859, the allegations related to these murders are extreme: they were premediated, involved dismemberment, and allegedly involved victims who posed no immediate threat to J.J.P. or MS-13. Further, J.J.P. was not merely a conspirator; the Information contends that J.J.P. actively wielded weapons during the violent attacks. In fact, he was allegedly so involved that his conduct earned him the nickname "Little Jason" within the Fulton clique—an apparent reference to the violent antagonist in a horror franchise. (Mot. Transfer at 21.) The violent assaults and racketeering activity also underlying the charges against J.J.P. provide additional, but unnecessary, support for the conclusion that this factor—the most important factor in the analysis—weighs heavily in favor of transfer.

### 3. *The Extent and Nature of the Juvenile's Prior Delinquency Record*

The parties agree that J.J.P. has no prior delinquency record and that this factor weighs against transfer.[2] The Court agrees.

### 4. *The Juvenile's Intellectual Development and Psychological Maturity*

J.J.P. initially performed well academically after arriving in America, and in the ninth grade, he received As and Bs in his classes. (Gov't Ex. 4 at 7, ECF 22-4.) His grades and attendance, however, dropped significantly the following year and he failed several courses. (Gov't Ex. 6 at 4.) An evaluation conducted in 2017 as part of state criminal proceedings concluded that J.J.P. was either in the average or low average range on a variety of intelligence, comprehension, and reasoning tests. (Gov't Ex. 4 at 5.) These results, however, did not indicate an impairment. (*Id.* at 7.) The evaluation also concluded that J.J.P. did not appear to be suffering or have previously suffered from any mental health or substance abuse problems. (*Id.*; Gov't Ex. 6 at 3.) J.J.P.'s mother, however, stated that he was deeply impacted by the murder of his father and the death of his grandfathers. (Gov't Ex. 4 at 4.)

Although J.J.P.'s test results may indicate he was behind his peers intellectually, below average intelligence and reasoning, absent a diagnosable impairment, is generally not a sufficient basis on which to conclude this factor weighs against transfer. *See, e.g., Juvenile Male*, 554 F.3d at 469 (affirming the district court's conclusion that this factor was neutral where the juvenile's intellectual development was in the "low-average range" but he had demonstrated maturity through the responsibilities he took on at home). Similarly, although J.J.P. may have been deeply impacted by the loss of family members, there is nothing in the record suggesting these losses affected his ability to understand the nature or consequences of his actions.

---

[2] The Court declines to consider the incident that allegedly resulted in J.J.P.'s expulsion from Northwood High School in evaluating this factor, as it appears no criminal charges were ever filed. (Mot. Transfer at 8.)

6

In short, the record suggests that J.J.P. was neither uniquely mature or advanced for his age, nor was the opposite true; this supports a finding that this factor is neutral.

### 5. *Past Treatment Efforts and the Juvenile's Response to Such Efforts*

J.J.P. does not appear to have completed any formal treatment programs prior to or during his incarceration. (Mot. Transfer at 20.) During the transfer hearing, J.J.P. contended that he successfully completed an informal adjustment program after his expulsion from Northwood High School, but the Court does not see a reference to such a program in the record. Even if J.J.P. did complete such a program, the absence of information about its nature or its requirements limits its impact on the transfer analysis.[3]

Because it appears J.J.P. has participated in little to no programming, the Court concludes this factor is neutral. *See Juvenile Male*, 554 F.3d at 469 (affirming the district court's conclusion that this factor was neutral where the juvenile "had not been enrolled in any formal treatment program").

### 6. *The Availability of Programs to Treat the Juvenile's Behavioral Problems*

The government contends that similar programs are available in the adult and juvenile facilities where J.J.P. would be incarcerated if convicted. (Mot. Transfer at 20–21.) Although the government concedes that juvenile facilities tend to provide more individual attention to inmates, it also contends that adult facilities have a greater diversity of vocational training options (due to their larger populations). (*Id.*) J.J.P. does not dispute these characterizations of the relevant facilities.

---

[3] The Court also declines to give weight to a letter that J.J.P. allegedly wrote while he was incarcerated that suggests he continued to be involved with MS-13 after his arrest (and therefore, allegedly suggests that he is not likely to be amenable to treatment). (Gov't Ex. 5, ECF No. 22-5.) Because the authorship of the unsigned letter is disputed and the letter is not mentioned in the Information, the Court will not consider its contents in evaluating this factor.

7

Absent any indication that the programs in one type of facility are particularly suitable or unsuitable to J.J.P., the Court concludes this factor is neutral.

### III. Conclusion

After carefully weighing the relevant statutory factors, the Court concludes that transfer of J.J.P. to adult status is "in the interest of justice." § 5032. This conclusion is warranted even though only the second factor—the nature of the alleged offenses—weighs in favor of transfer, while the rest of the factors are either neutral or weigh against transfer.[4] Although the second factor should not necessarily be dispositive in a transfer analysis, the facts underlying the second factor here—J.J.P.'s direct participation in two premediated, gruesome murders—are extreme. To counteract them and avoid transfer to adult status, there needed to be clearly compelling reasons in the record on which the Court could conclude that J.J.P. was not fully culpable for his actions or that he is uniquely amenable to rehabilitation. The record does not support such conclusions. Although the Court highly values the JJDPA's goal to "encourage treatment and rehabilitation" for juveniles, *Robinson*, 404 F.3d at 858 (citation omitted), it also recognizes that "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) (citation omitted).

Accordingly, the Court will grant the government's motion to transfer J.J.P. to adult status.

DATED this 17 day of January, 2020.

BY THE COURT:

James K. Bredar
Chief Judge

---

[4] Indeed, the Court would have reached the same outcome even if the factors it found neutral—factors four, five, and six—actually tipped against transfer.

8