IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Case No.: 19-cr-0132-JKB |
| J.J.P. (Male Juvenile) | * | |
| Defendant. | * | |

### MOTION FOR RECONSIDERATION OF COURT'S ORDER TRANSFERRING THIS CASE TO PROSECUTE J.J.P. AS AN ADULT

The Defendant, J.J.P., through his undersigned counsel, Charles N. Curlett, Jr. and Lauren McLarney of Rosenberg Martin Greenberg, LLP, hereby moves this Honorable Court to reconsider its decision to transfer this case to the United States District Court and subject J.J.P. to adult prosecution. As explained herein, the government did not advocate, and therefore the Court did not apply, the correct legal standard in reaching its decision. When the test for transfer of a juvenile case is properly considered in light of Supreme Court precedent, J.J.P. should be prosecuted not as an adult, but as a child.

### BACKGROUND

On March 20, 2019, the government filed a Juvenile Information (ECF 1), charging J.J.P. with seven Racketeering-related offenses arising out of his alleged involvement with the Fulton Locos Salvatruchas clique of MS-13.[1] Significantly, among the factual allegations underlying some of the charges, J.J.P. was alleged to

---

[1] Count I was Conspiracy to Participate in a Racketeering Enterprise; Count II was Racketeering; Counts III and V were Attempted Murder in Aid of Racketeering; Counts IV and VI were Assault with a Dangerous Weapon Resulting in Serious Bodily Injury in Aid of Racketeering; Count VII was Assault with a Dangerous Weapon in Aid of Racketeering. J.J.P. was *not* charged with Murder in Aid of Racketeering.

have participated in two murders when he was just 15 years old. While those alleged homicides were unquestionably violent, there is no reason to believe that J.J.P. instigated or led the attacks. The allegations indicate that J.J.P. was one of the foot soldiers instructed by gang leadership to carry out the homicides as a group.

On April 10, 2019, the government filed a Motion and Memorandum of Law In Support of Motion to Transfer J.J.P. to District Court For Prosecution as an Adult. ECF 22. As described in more detail below, a request to transfer a juvenile to federal court is subjected to a six factor test, wherein the Court considers the juvenile's age, the nature of the alleged offense, and other key issues, to determine if transfer is in the interest of justice. *See* 18 U.S.C. § 5032. The government urged that the nature of the alleged offenses – particularly the alleged homicides underlying some of the charges – demanded and justified transferring J.J.P. for adult prosecution.

J.J.P.'s then-defense counsel filed a terse and incomplete opposition to the government's motion, which did not address the applicable legal standard or whether transfer of J.J.P. was appropriate under the six factor test. ECF 34.[2]

A hearing was held on January 13, 2020. Four days later, the Court ruled that J.J.P. should be transferred to adult status and granted the government's motion. In its memorandum opinion, (ECF 42), the Court explained that its decision was based

---

[2] Defense counsel, who has since withdrawn from the case (*see* ECF 44) advised that "this is a bare bones" filing and he intended to "supplement this opposition with a more complete memorandum" upon his review of discovery. The only argument advanced was that the government intentionally delayed prosecuting J.J.P. in federal court to gain tactical advantages – namely, that J.J.P. would age out of minority, and the government could therefore argue that no treatment programs were available to meet his needs. No supplement was filed. By itself, the brief is profoundly inadequate.

entirely on the nature of the allegations: "Although the second factor should not necessarily be dispositive in a transfer analysis, the acts underlying the second factor here – J.J.P.'s direct participation in two premeditated, gruesome murders – are extreme. To counteract them and avoid transfer to adult status, there needed to be clearly compelling reasons in the record on which the Court could conclude that J.J.P. was not fully culpable for his actions or that he is uniquely amenable to treatment." ECF 42 at p.8. A footnote underscored the profound weight accorded to the nature of the offense. *Id.* at n.4. ("Indeed, the Court would have reached the same outcome even if the factors it found neutral – factors four, five, and six – actually tipped against transfer.").

J.J.P. now asks the Court to reconsider this decision.

## LEGAL STANDARD

The Federal Rules of Criminal Procedure do not address motions for reconsideration. Thus, courts have consulted the Federal Rules of Civil Procedure and found analogous standards. *See United States v. Srivastava*, 476 F.Supp.2d 509, 511 (D. Md. 2007), *remanded on other grounds*, 540 F.3d 277 (4th Cir. 2008). Rule 59(e) of the Federal Rules of Civil Procedure authorizes three grounds for amending or altering an earlier judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).

## DISCUSSION

**I.  *The Court's use of an erroneous legal standard was a clear error of law.***

The law has historically recognized that juveniles, as a class, cannot be expected to operate with the same level of maturity, judgment, or impulse control as adults.[3] Juveniles have virtually no legally recognized independence or autonomy. But the criminal justice system often acts as an exception to this rule, requiring children to take adult ownership for criminal conduct and submit to adult penalties.

The Juvenile Justice and Delinquency Prevention Act of 1974 ("the Act") provides the procedure for handling juveniles in the federal court system and when they can be transferred for adult prosecution. 18 U.S.C. § 5032. There are several "procedural hurdles" that must be passed before the Court can exercise jurisdiction,[4] *United States v. Juvenile Male*, 554 F.3d 456, 460 (4th Cir. 2009); § 5032 at ¶¶1-3, then the Court must determine if transferring the juvenile to adult status would be "in the interest of justice." § 5032 at ¶¶ 4,5. "The Government has the burden of proving that a transfer would be in the interest of justice by a preponderance of the evidence." *United States v. Robinson*, 404 F.3d 850, 858 (4th Cir. 2005) (citing *United States v. Juvenile Male #1*, 86 F.3d 1314, 1323 (4th Cir. 1996)). To render a decision, the Court must make findings regarding each of the following enumerated factors:

(1)  the age and social background of the juvenile;
(2)  the nature of the alleged offense;

---

[3] *See, e.g.*, Restatement 2d. of Torts § 283A, Comment (a) ("A child is a person of such immature years as to be incapable of exercising the judgment, intelligence, knowledge, experience, and prudence demanded by the standard of the reasonable man applicable to adults.").

[4] J.J.P. is not seeking reconsideration of the Court's conclusion that it has jurisdiction.

4

(3) the extent and nature of the juvenile's prior delinquency record;
(4) the juvenile's present intellectual development and psychological maturity;
(5) the nature of past treatment efforts and the juvenile's response to such efforts; and
(5) the availability of programs designed to treat the juvenile's behavioral problems.

§ 5032 at ¶5. With regard to the second factor, the Act expressly requires:

> In considering the nature of the offense, as required by this paragraph, he court shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms. Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer.

*Id.* The Court has discretion to decide how much weight to give each factor. *Robinson*, 404 F.3d at 858.

Over 30 years after the Act was enacted, the Supreme Court in 2005 began issuing a series of landmark opinions about juvenile justice, propounding sweeping reforms to preclude courts from assessing juvenile acts through the same lens as adult conduct. Those decisions rested on one fundamental truth: ***children are scientifically and thus constitutionally different than adults.***

In *Roper v. Simmons*, the Supreme Court held that an individual cannot be executed for crimes committed when they were a juvenile. 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). In doing so, the Court recognized "the diminished culpability of juveniles" based on three key differences between children and adults. *Id.* at 571. "First, as any parent knows and as the scientific and sociologic studies respondent and his amici cite tend to confirm, 'a lack of maturity and an

5

underdeveloped sense of responsibility are formed in youth more often than in adults and are more understandable among the young.'" *Id.* at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* Third, "a juvenile is not as well formed as that of an adult." *Id.* at 570. Accordingly, "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable damage." *Id.* at 572. Because juveniles are "less culpable" than adults, the Eighth Amendment precludes states from subjecting juveniles to punishment reserved only for the worst offenders. *Id.* In other words, juveniles, by definition, cannot be the "worst" offenders, regardless of their conduct.

Five years later, in *Graham v. Florida*, the Supreme Court held it was unconstitutional to sentence a juvenile offender to life without parole for a non-homicide offense. 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). The Court reflected on *Roper*, the prevailing science behind its decision, and how the nature of a child's offense cannot be considered in a vacuum, given the binary difference between juveniles and adults.

> No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's amici point out, ***developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.*** For example, parts of the brain involved in behavior control continue to mature through late adolescence. *See* Brief for American Medical Association et al. 16–24; Brief for American Psychological Association et al. 22–27. Juveniles are more capable of change than are adults, and their actions are less likely

6

to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S.Ct. 1183. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid*. These matters relate to the status of the offenders in question; ***and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.***

*Id.* at 68 (emphasis added).

In 2011, the Supreme Court held in *J.D.B v. North Carolina* that a child's age is a factor to be considered in the *Miranda* custody analysis, meaning that a court should ask what a reasonable child would believe in similar circumstances, not a reasonable adult.  564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). The reasoning from *Roper* and *Graham* advanced, as the Court famously explained that "[a] child's age is far 'more than a chronological fact.'" *Id.* at 272 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). The Court clarified that the difference between children and adults is a simple, universal truth, not a technical distinction that can be ignored, rationalized away, or neutralized by artificial nuance.

> Though the State and the dissent worry about gradations among children of different ages, that concern cannot justify ignoring a child's age altogether. Just as police officers are competent to account for other objective circumstances that are a matter of degree such as the length of questioning or the number of officers present, so too are they competent to evaluate the effect of relative age. Indeed, they are competent to do so even though an interrogation room lacks the "reflective atmosphere of a [jury] deliberation room," *post*, at 2416. The same is true of judges, including those whose childhoods have long since passed, *see post*, at 2416. In short, officers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. ***They simply need the common sense to know that a 7–year–old is not a 13–year–old and neither is an adult.***

7

*Id.* at 279-80 (emphasis added).

Finally, in *Miller v. Alabama*, the Supreme Court held that mandatory life without parole for juvenile offenders was unconstitutional. 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). It provided a substantial recitation of *Roper* and *Graham*, making it clear that those "decisions rested not only on common sense—on what 'any parent knows'—but on science and social science as well." *Id.* at 471 (quoting *Roper*, 543 U.S. at 569, 125 S.Ct. 1183). The Supreme Court underscored the studies on which it had relied to determine that juvenile behavior – even brutal behavior and homicide – does not indicate a juvenile's capacity for change or inherent depravity, in light of what the science shows about brain development and behavioral patterns. *See id.* at 471 – 77.

Through these cases, the Supreme Court disavowed the '*if you act like an adult, we will treat you like an adult*' approach to juvenile justice. The Fourth Circuit has acknowledged this jurisprudence, as well as the fundamental principle on which it is based. *See Malvo v. Mathena*, 893 F.3d 265, 271 (4th Cir. 2018) ("In its Eighth Amendment jurisprudence, the Supreme Court recognizes that persons under the age of 18 as a class are constitutionally different from adults for purposes of sentencing. Juveniles inherently lack maturity; they do not have a fully formed character and a fully developed sense of responsibility; and they are both more susceptible to external influences and less able to control their environment than are adults.").

Against this backdrop, this Court must now consider the Act and apply the test for federal transfer in cases like J.J.P.'s following the Supreme Court's clear and

repeated directive that a child's juvenile status should not be eclipsed by the nature of his delinquent conduct.  The Fourth Circuit cases relied upon by the government, and in turn by this Court, predate this line of Supreme Court jurisprudence.  It is now error to assume that the nature of the alleged offense is the most important factor in the transfer analysis. *See Robinson*, 404 F.3d at 859 (2005) ("in determining if a transfer is in the interest of justice, the nature and severity of the crimes is the most important factor."); *Juvenile Male*, 554 F.3d at 469 (2009) ("in weighing the statutory factors, the nature of the offense is significant." (citation omitted)). That flawed approach is most resounded in cases where the allegations were severe or violent, even though such circumstances already would and should, under the balanced test prescribed in the Act, lead the Court to find that the second factor cuts in favor of transfer to adult court. By placing undue emphasis on the second factor to the detriment of factors regarding age and a juvenile's capacity to be rehabilitated, particularly when the charges evoke fear and disgust, the Fourth Circuit's standard today runs afoul of the landmark cases by the Supreme Court cited above, and flies in the face of the science behind them.

That ***accusations*** of a heinous nature deserve more weight than ***immutable truths*** about a defendant's age and physiological development cannot be reconciled with *Roper*, *Graham*, *J.D.B.*, and *Miller*. Those cases stand for the proposition that the criminal justice system cannot view juvenile conduct the same way it views adult conduct. Thus, to apply a standard in which transfer is justified solely by a child's violent conduct is not only wrong, it is unconstitutional.

Yet that was the standard applied in J.J.P.'s case. In the excerpt above, *supra* p.3, the Court stated that J.J.P. needed to offer something more than youth, a loving mother, and lack of treatment history to show he "was not fully culpable for his actions," because the homicide allegations were too extreme to find otherwise. In doing so, the Court took the *Robinson* and *Juvenile Male* approach, indicating that the nature of the allegations foreclosed any possibility that J.J.P. could maintain his juvenile status absent some "unique" or "compelling" circumstance. In essence, the Court shifted the burden onto J.J.P. to prove he was ***not*** fully culpable for his actions.

The government bears the burden of proof in a transfer hearing, not the juvenile. *Richardson*, 404 F.3d at 858. The science shows that a juvenile is too underdeveloped and susceptible to peer influence to display irrevocable depravity, and the Supreme Court has established that a juvenile is, by definition, "less culpable" than an adult who commits the same conduct. *Roper* 543 U.S. at 572, 125 S.Ct. 1183. Thus, the standard underlying the Court's decision flies in the face of the statute, the science, and the Supreme Court.

Because the Court applied a legal standard out of step with clear and controlling authority, it rendered an unjust ruling in favor of transfer. Accordingly, the Court should reconsider its decision to transfer J.J.P. to adult status.

**II.   *Evidence omitted from the hearing or inadequately argued under the wrong standard must be re-framed in light of controlling precedent.***

When the test for transferring a juvenile's case is applied properly, the government's motion to transfer J.J.P. for adult prosecution must be denied.

10

### a. The age and social background of the juvenile.

J.J.P. was 15 at the time of the alleged offenses, and the Court determined that this young age resulted in the first factor weighing against transfer. ECF 42 at 4. However, the Court also determined that J.J.P's social background "cut both ways[,]" pointing out that he had entered the United States by himself and had a poor attendance record at school. *Id.* That J.J.P. was allowed to enter this nation by himself and then avoid school reflects on his caretakers, not him. As the government acknowledges, his was successful in school through ninth grade. ECF 22. "While at Northwood for 9th grade, Jose attended for 134 days and was absent for 4 days. He earned good grades, with school records indicating mostly A's and B's." *Id.* at Exh. 4, p.2. He has the capacity to do well.

Nevertheless, the defense agrees with the Court's ultimate assessment on this factor. For purposes of the instant motion, the defense simply urges the Court to consider this factor sufficient to establish J.J.P.'s "unique amenability to treatment."

### b. The nature of the alleged offense.

As discussed *supra*, the Court assigned undue weight to this factor. Significantly, the Court did not address the dispositive issue under this factor: whether J.J.P. played a leadership role or persuaded others to participate in the crime. There is no indication that J.J.P. was anything other than a follower of gang leadership in these alleged murders. J.J.P. is not accused of supplying the information that led to the victim's targeting or leading the group of people who carried out the attacks. J.J.P. is not accused of recruiting the other individuals who

purportedly participated in the homicides. Quite the opposite, J.J.P. allegedly acted as part of a violent mob; his actions were distinguishable from the leaders.

Furthermore, when the allegations are considered in light of the Supreme Court's recitation of scientific research on juveniles, J.J.P.'s abhorrent behavior – if accepted as alleged – is seen through a different light. Studies show that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569, 125 S.Ct. 1183. J.J.P. was allegedly associated with MS-13 for years, and he was purportedly instructed to go into the woods with several older, armed gang members to commit a homicide. Not only was he under enormous influence from others, but was there any meaningful way to refuse this task? Even the most prudent adult would find it difficult, isolated from everyone except for armed compatriots and the lone victim, to do the right thing. History is replete with the cases of soldiers who followed illegal orders, lacking the moral courage to stand up against them. While they bear responsibility, their culpability is far less than that of those who gave the orders. And the Supreme Court's view on the science about juvenile culpability cannot be ignored; the science suggests that J.J.P.'s actions do not illustrate an irrevocable depravity but a predictable tendency to follow his peers and submit to their destructive pressure.

### c. The extent and nature of the juvenile's prior delinquency record.

The Court concluded that J.J.P. had no prior delinquency record, thus this factor weighs against transfer. ECF 42 at 6. In the Supreme Court cases described

above, the Court recognized that juvenile offenders often outgrow their delinquent behavior. Here, J.J.P. did not even have a documented history of delinquent behavior.

### d. The juvenile's present intellectual development and psychological maturity.

The Court determined that J.J.P. was neither uniquely mature for his age nor the opposite, thus this factor was deemed neutral. ECF 42 at 6-7. If a juvenile's maturity is on par with his age, then he should be viewed as the juvenile that he is. That in and of itself makes him uniquely amenable to treatment. Under the prevailing views discussed above, it does not follow that a child who is ***not*** mature for his age has somehow ***not*** made a showing in favor of juvenile treatment.

Moreover, the Court acknowledged that J.J.P. was deeply impacted by the loss of his father, who was viciously murdered at a pivotal time in J.J.P.'s life, and other family members. *Id.* at 6. Such experiences cannot be minimized, when assessing his psychological maturity. Furthermore, the Court noted that J.J.P. was behind his peers intellectually but not impaired, thus there was not enough to find this factor weighed against transfer. *Id.* (citing *Juvenile Male*, 554 F.3d at 469). While J.J.P. does not present with a diagnosable impairment, the lack of a disability does not by itself somehow render him less of child or give him the same capacity as an adult.

### e. The nature of past treatment efforts and the juvenile's response to such efforts.

The Court acknowledged that J.J.P. has not completed any formal treatment programs but determined that this factor is neutral. ECF 42 at 6-7. That J.J.P. has never been given any meaningful opportunity to change is not his fault.

Quite the opposite, J.J.P. has lost critical time in the adult penal system where he clearly received no treatment for the trauma he has experienced and ultimately was driven right back into the hands of MS-13. Back in the Summer of 2017, J.J.P. was charged in state court with several serious offenses arising out of the Wheaton Park assaults, which form the basis for one Count of Attempted Murder in Aid of Racketeering alleged in this case. In September of 2017, J.J.P.'s counsel moved to transfer his case to the Juvenile Court. Later that month, the Maryland Department of Juvenile Services ("DJS") issued a Transfer Summary, in which it assessed the five factors under Maryland law, that the Circuit Court must consider when determining whether to transfer a juvenile out of adult court.[5], Although DJS ultimately recommended against transferring J.J.P. to the juvenile system, it still took care to note several compelling mitigating facts relevant to his case. For example:

> J.J.P.'s "biological father was murdered in El-Salvador in February 2012. The mother reported that the father was a taxi driver and some gang members demanded money from him. When he refused, he was shot in the neck."

J.J.P. was ultimately convicted and spent time in state facilities. Clearly, the system did not bother to address his needs or treat the painful experiences that led him to gang life. Yet, these institutional failures were somehow projected onto J.J.P., and the Court found this factor to be neutral. Under the appropriate standard, that

---

[5] Those factors are: 1) the age of the child; 2) the mental and physical condition of the child; 3) the child's amenability to treatment; 4) the nature of the alleged offense; and 5) public safety.  *See* Md. Code Ann. Cts. & Jud. Proc. § 4-202.

J.J.P. had never been given the opportunity to change would – in and of itself – demand that he receives at least some modicum of chance at rehabilitation.

### f. The availability of programs designed to treat the juvenile's behavioral problems.

The Court found that this factor was neutral, even though "the government concedes that juvenile facilities tend to provide more individual attention to inmates[.]"ECF 42 at 7. The Court also noted the government's contention "that adult facilities have a greater diversity of vocational training options (due to their larger populations)." *Id.* That there might be programs which might treat his adult vocational aspirations is patently irrelevant to his options for behavioral treatment in the juvenile system. If programs are available that could give J.J.P. a chance at reclaiming a healthy and productive life, this factor should weigh against transfer.

## CONCLUSION

For the foregoing reasons, the Court should reconsider its order transferring J.J.P. for adult prosecution and instead deny the government's motion.

Date: March 25, 2020

                                              Respectfully submitted,

                                              */s/ Charles N. Curlett, Jr.*

                                              Charles N. Curlett, Jr. (Fed. Bar #28246)
                                              Lauren McLarney (Fed. Bar #20982)
                                              Rosenberg Martin Greenberg, LLP
                                              25 S Charles Street, 21st Floor
                                              Baltimore, Maryland 21202
                                              Phone: (410) 727-6600
                                              ccurlett@rosenbergmartin.com
                                              lmclarney@rosenbergmartin.com